In the Matter of D.B., a Child Alleged to be in Need of Services.

Cynthia BIRCHFIELD, Appellant (Respondent below),

v.

BARTHOLOMEW COUNTY DEPARTMENT OF PUBLIC WELFARE, Appellee (Petitioner below).

No. 03A01-9006-CV-230.

Court of Appeals of Indiana, First District.

Nov. 7, 1990.

Richard T. Eppard, Columbus, for appellant.

Donald A. Dickherber, Lawson, Pushor, Mote & Coriden, Columbus, for appellee.

ROBERTSON, Judge.

Cynthia Birchfield appeals the involuntary termination of the parent-child relationship with her daughter, D.B. Cynthia attacks the sufficiency of the evidence. In her brief, she raises three issues regarding the sufficiency of the evidence which she consolidates into one argument. We consolidate our analysis and affirm.

FACTS

Cynthia Birchfield is the mother of five children, four girls and one boy. D.B., the youngest child is the subject of this action. D.B. was born May 17, 1983. She was five years old when removed from Cynthia's care by the Child in Need of Services (CHINS) action and six years old at the time the termination hearing was held in this matter on January 17, 1990. The ages of the other children are not obvious from the briefs. At the time of the termination hearing, the three older girls were of junior-high and high school age and had been placed in the Indiana Girls' school. The boy, Danny, was approximately ten (10) years old at the time of the termination hearing and had been placed in an institution in Pennsylvania.

D.B. and her three older sisters were removed from Cynthia's apartment in October of 1988 by order of the juvenile court as a result of a CHINS action filed by the Bartholomew County Department of Public Welfare (DPW). The initial hearing was held November 30, 1988 and D.B. was made a ward of the DPW by the juvenile court's dispositional decree dated December 14, 1988.

At the time the girls were removed from the apartment in October of 1988, Danny had already been removed from Cynthia's care and was living in a foster home. The initial plan was for D.B. to be returned to Cynthia's care. It was hoped that Cynthia could better manage with just one child at home. However, conditions at home continued to deteriorate and D.B. was removed from the apartment and placed in foster care in January of 1989.

At the time of the initial dispositional hearing, the DPW presented evidence of 1) neglect, including a lack of supervision and educational neglect (the older girls had excessive absences from school), 2) the living conditions were unstable, 3) too many people—particularly young men—were coming and going from the apartment at all hours, 4) Cynthia, a single parent, was emotionally drained from a) past abuse by her husband, b) heavy child care responsibility, c) her lack of parenting skills, d) mental health problems, and e) her inability to institute house rules or enforce them.

Services made available to Cynthia included 1) a psychological evaluation of the child, 2) therapy for the mother, 3) homemaker's and caseworker's services, 4) twenty-four hour emergency caretaker and homemaker services, 5) individual and family counseling, 6) emergency shelter, and 7) mental health counseling. The DPW devel-

oped and implemented a plan designed to help Cynthia overcome her lack of parenting skills. This plan included a psychological evaluation of Cynthia in Bloomington, Indiana, and on-going counseling with Dr. Larry Ewert, a psychologist associated with the Quinco Consulting Center in Columbus, Indiana. The counseling was intended to develop Cynthia's parenting skills, her self esteem, and to teach her appropriate discipline methods. The DPW offered taxi service to enable Cynthia to make her appointments.

Also, pursuant to the DPW's plan, a caseworker, homemaker, and a Court Appointed Special Advocate all made regular and frequent home visits and made suggestions as to how Cynthia might fulfill her parental obligations. D.B. was placed in a foster home and was to spend time with a Big Sister. Cynthia was to visit with D.B. frequently and cooperate with the caseworker to facilitate reunification with D.B.

At the time the initial CHINS proceeding was filed and D.B. was removed from the home, her father Kenneth Birchfield, did not live at home and was restrained by court order from coming around the apartment. Kenneth had a history of being abusive to Cynthia and the children. Because Kenneth was thought to be out of the picture, the DPW did not offer him any parenting services. Accordingly, the trial court did not terminate his parent-child relationship with D.B. However, Kenneth was present in the apartment in violation of the restraining order many times during the period Cynthia was receiving services from the DPW. At the time of the final hearing, Kenneth and Cynthia were back together living in Indianapolis. The DPW is presently offering Kenneth parenting services.

The evidence presented at the termination hearing most favorable to the judgment reveals that strangers, especially men, continued to visit and live in the home. D.B. would sometimes be left in the care of these strangers. D.B. would occasionally be locked out of the apartment—sometimes in the winter—and have to wait for an adult to return home to let her in.

D.B. was exposed to strangers engaging in sexual intercourse in the home. There was often insufficient food to go around.

One man who stayed at the apartment became quite attached to D.B. He told D.B. she need not listen to her mother and should rely on him instead. Cynthia could not get rid of this man, so she asked the DPW for help. The police were required to remove this man and his female companion from the premises.

Cynthia failed to reapply for ADC or foodstamps as suggested by the homemaker. Also, Cynthia admitted she had been referred to Family Services but never went. She explained, "I just didn't. Well, I guess I was just lazy." She similarly admitted she did not follow through with the counseling with Dr. Ewert. She testified she liked Dr. Ewert and would open up to him, but quit because one day she and the children were there and "the kids ... just took a notion they were going to leave and did. After that I never went back to Dr. Ewert. It's not because I didn't want to, I just didn't."

The DPW's present plan for D.B. is to put her up for adoption.

## DECISION

Whether clear and convincing evidence exists to support the trial court's decision to terminate the parent-child relationship between Cynthia and D.B.?

The right of parents to establish a home and bring up children is protected by the Fourteenth Amendment to the United States Constitution. *Pierce v. Society of Sisters* (1925), 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070. The right to raise one's children has been recognized to be one of "the basic civil rights of man." *Skinner v. Oklahoma* (1942), 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655. The right to raise one's children is far more precious than property rights. *May v. Anderson* (1953), 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221. In *Prince v. Massachusetts* (1944), 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645, the Supreme Court stated:

It is cardinal with us that the custody, care and nurture of the child reside first in the parents whose primary function and freedom include preparation for obligations the State can neither supply nor hinder.

In *Bellotti v. Baird* (1979), 443 U.S. 622, 634, 99 S.Ct. 3035, 3043, 61 L.Ed.2d 797, the Supreme Court held:

> [the] unique role in our society of the family, the institution by which we inculcate and pass down many of our most cherished values, moral and cultural, requires that constitutional principles be applied with sensitivity and flexibility to the special needs of parents and children. (Citation omitted.)

Involuntary termination of parental rights is the most severe action a juvenile court can take. *In re Matter of Robinson* (1989), Ind., 538 N.E.2d 1385 (Dickson, J. dissenting). Termination severs all rights of a parent to his or her child. *Id.* Therefore, termination is designated to be a last resort, available only when all other reasonable efforts have failed. *Id.*

This policy is a recognition of the constitutional rights of parents to the custody of their children, and the State's authority to interfere with that right only in certain limited circumstances. *Id.*

■ To effect a termination of the parent-child relationship, the DPW must present clear and convincing evidence to support the elements of IND.CODE 31-6-5-4. *J.K.C. v. Fountain County Dept. of Public Welfare* (1984), Ind.App., 470 N.E.2d 88. I.C. 31-6-5-4 defines the exclusive means to effect an involuntary termination of a parent-child relationship and requires:

> (1) the child has been removed from the parent for at least six (6) months under a dispositional decree;
> (2) there is a reasonable probability that the conditions that resulted in the child's removal will not be remedied;

(3) termination is in the best interests of the child; and

(4) there is a satisfactory plan for the care and treatment of the child.[1]

■ The trial court should judge a parent's fitness to care for her children as of the time of the termination hearing, taking into consideration evidence of changed conditions. *J.K.C., id.* However, recognizing the permanent effect of termination, we have stated the court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id.* In determining the best interests of the children, the trial court must look beyond the factors identified by the DPW to the totality of the evidence. *Id.* Children are not removed from the custody of their parents because there is a better place for them, but because the situation while in the custody of their parents is wholly inadequate for their very survival. *Id.* This is a graduated yardstick according to which the particulars of a case must be measured. *Id.* In so doing, the trial court must subordinate the interests of the parents to those of the children involved. *Id.* However, the trial court need not wait until the children are irreversibly influenced by their deficient lifestyle such that their physical, mental and social growth is permanently impaired before terminating the parent-child relationship. *Id.*

■ In determining whether the trial court's decision to terminate the parent-child relationship is supported by clear and convincing evidence, we may not reweigh the evidence or judge the credibility of the witnesses. *Id.* We may only consider that evidence most favorable to the judgment. *Id.*

■ Cynthia first asserts the evidence is insufficient to support the determination that there is a reasonable probability that the conditions that resulted in D.B.'s removal will not be remedied. The evidence presented at the final hearing, as outlined

---

1. This is the version of I.C. 31-6-5-4 in force at the time this action was filed. This statute was amended slightly in 1990.

in the "FACTS" section above, indicates that the conditions in Cynthia's home had not improved since D.B. was removed from the apartment and placed in foster care. Further, Cynthia displayed a pattern of unwillingness to deal with her parenting problems and to cooperate with her counselors and those providing social services.

Such a pattern of unwillingness to deal with parenting problems and to cooperate with counselors and those providing social services—in conjunction with unchanged and unacceptable home conditions—has been held to support a finding that there exists no reasonable probability the unacceptable conditions in the home will be remedied. *In re Matter of M.J.G.* (1989), Ind.App., 542 N.E.2d 1385. Therefore, we find the evidence sufficient to support the trial court's decision.

Cynthia alleges the evidence is insufficient to support a determination that the termination of her parental rights is in D.B.'s best interests. She points out that a social worker who testified at trial was unable to say whether it was in D.B.'s best interests to be reunited with her mother as the social worker did not really know the family. However, we do not reweigh evidence. Substantial evidence of probative value was presented at trial, as set out in the FACTS section above, upon which the trial court could properly conclude that ter-

mination was in D.B.'s best interests. Therefore, we find no error.

Cynthia next asserts that DPW failed to satisfy its obligation under I.C. 31–6–1–1(5) to provide services to strengthen family life by assisting her to fulfill her parental obligations. She suggests efforts at reunification were doomed because the DPW did not adequately address her mental health problems.

However, as outlined above in the FACTS section, the DPW offered and performed many services designed to help Cynthia correct her parenting deficiencies and work toward reunification with D.B. These services included mental health services and counseling with Dr. Larry Ewert, a psychologist associated with the Quinco Consulting Center. We hold the trial court did not err in finding that the DPW met its statutory obligations in offering Cynthia services. Therefore, we find no error.

Judgment affirmed.

RATLIFF, C.J., and BAKER, J., concur.